Peter KUMAR, formerly known as Prem Kumar, Plaintiff,

v.

BOARD OF TRUSTEES OF the UNIVERSITY OF MASSACHUSETTS, Defendant.

Civ. A. No. 78–0036–F.

United States District Court, D. Massachusetts.

July 1, 1983.

Richard M. Howland, Amherst, Mass., for plaintiff.

Lawrence Bench, U. of Mass., Boston, Mass., for defendant.

## OPINION

FREEDMAN, District Judge.

### I. INTRODUCTION

This case is before the Court following a five-day bench trial. At the close of the evidence, the Court instructed the parties to submit proposed findings of fact and conclusions of law and indicated that the Court would then take the matter under advisement. Herein, the Court sets forth its Findings of Fact and Conclusions of Law in accordance with F.R.Civ.P. 52(a).

However, before turning to Findings and Conclusions, the Court must first address a troublesome procedural issue which initially arose on the eve of trial and has subse-

quently persisted while this case was under advisement. A brief account of the history of this litigation is necessary to dispose of the issue.

### A. Plaintiff's "Motion for Trial"

In essence, the factual context of this suit is the denial of tenure to plaintiff at the University of Massachusetts. The initial Complaint was filed in June 1978 and alleged, *inter alia,* the denial of tenure to plaintiff, the filing of charges with the Equal Employment Opportunity Commission ("EEOC"), and the receipt of a "right to sue letter" from the EEOC. While the plaintiff prayed not only for an order that defendant grant plaintiff tenure with retroactive payment but also damages "for lost earnings, and other damages sustained by plaintiff," Complaint, Prayer for Relief, ¶ 2, fairly read the Complaint alleged only one cause of action—that is, a Title VII claim pursuant to 42 U.S.C. § 2000e–5 for unlawful national origin discrimination. Discovery ensued, pre-trial conferences were held, and appearances of new counsel and disappearances of former counsel were filed on behalf of both plaintiff and defendant. In August 1981, plaintiff filed a motion for leave to file an Amended and Supplemented Complaint, which was allowed by the Court, no opposition having been filed. The Amended and Supplemented Complaint alleged two counts, the first reiterating the Title VII claim of the initial Complaint, and the second alleging that "sham" grievance proceedings were conducted by the defendant in plaintiff's case in retaliation against the plaintiff because he had filed a complaint with the EEOC, all in violation of 42 U.S.C. § 2000e–3(a). The prayer for relief again sought an order that defendant grant plaintiff tenure, retroactive to September 1976, "with all payments and emoluments retroactive therefrom," and that defendant pay damages to plaintiff resulting from the alleged unlawful discrimination. Amended and Supplemented Complaint, Prayer for Relief, ¶¶ 1 and 2. Defendant filed an answer in November 1981. The sole motion for leave to amend subsequently filed did not address matters of substance, but merely reflected the plaintiff's change of name.

In January 1982 plaintiff filed a motion for summary judgment as to Counts I and II, F.R.Civ.P. 56(c), which motion the Court denied in a bench ruling in June 1982. The case was then noticed for trial on January 17, 1983.

Given the allegations of the Amended and Supplemented Complaint, the Court was somewhat perplexed when plaintiff filed a request for individual voir dire of jurors on January 11, 1983. Then, on the day of trial, plaintiff filed a trial brief discussing not only Title VII claims, but also claims pursuant to 42 U.S.C. § 1981 and Massachusetts state law—specifically, state law claims for violation of M.G.L. c. 151B §§ 5 and 9, for intentional infliction of emotional distress, and for violation of the Massachusetts Fair Information Practices Act, M.G.L. c. 66A. After some discussion with counsel, the Court ordered that trial would proceed solely on the Title VII claims.

Following trial, plaintiff filed a "Motion to Transfer Claims," wherein plaintiff stated that:

> Whereas, the court declined to exercise pendent jurisdiction over the claims in the above-entitled matter arising under 42 U.S.C. §§ 1981 and 1983, M.G.L. c. 151B, c. 66A and tort claims under Massachusetts law, the plaintiff Peter Kumar prays that these claims be transferred to the appropriate state court, the Superior Court of Hampshire County.

Plaintiff's Motion to Transfer Claims, at 1. Defendant filed opposition to this motion noting, *inter alia,* that such claims were never included in the initial Complaint or in the Amended and Supplemented Complaint. The Court denied the motion in May 1983, endorsing thereon as follows: "There being no authority for such transfer, the motion is denied. So Ordered."

On June 10, 1983, plaintiff filed a "Motion for Trial" and recited therein as follows:

> The Plaintiff ... moves this Court for trial on the pendent issues and collateral issues raised in the pleadings and ac-

knowledged by the Court at the time of trial and in the prior motion for summary judgment filed, heard and argued and denied by the Court. Whereas the Court has denied for lack of authority the Plaintiff's motion to transfer the pendent actions to the State Superior Court, the Plaintiff concludes that whereas this Court has and had jurisdiction over all pendent claims that such jurisdiction remains vested in this Court and the Plaintiff has never dismissed such claims nor has the court denied the claims the plaintiff seeks to have these claims pending on the docket for trial. The Plaintiff recognizes that the Plaintiff has not requested a jury on these actions despite his right for the same nor has the defendant. Plaintiff's Motion for Trial, at 1. On June 21, 1983, defendant filed its opposition to this motion, noting that "no such pendent or other claims were ever raised by the Complaint or Amended Complaint or filed in this Court, the case having been treated since the outset ... as one brought solely under the Civil Rights Act of 1964;" and further arguing that the Court would lack jurisdiction over such claims under the Eleventh Amendment and the jurisdictional provisions of the state statutes to which plaintiff referred. Defendant's Opposition, at 1.

The Court agrees with defendant and denies plaintiff's motion. The claims to which plaintiff refers were simply never raised in this Court in either the initial Complaint or the Amended and Supplemented Complaint and from the outset, this case has proceeded as a Title VII case. Indeed, the Amended and Supplemented Complaint is expressly structured in *two* counts, see F.R.Civ.P. 8(e), and no mention is made of 42 U.S.C. §§ 1981 or 1983, or of any state law claims. Even under the broadest interpretation of the pleadings consistent with the concept of "notice pleading," the complaints filed by plaintiff cannot be said to have afforded defendant fair notice of claims other than the Title VII claims expressly alleged. Further, even if the Court were to treat the plaintiff's motion as one for leave to file an amended complaint, the Court would certainly deny the motion. While amendments are to be allowed freely, and pleadings may be amended to conform to the evidence at trial, F.R.Civ.P. 15(b), the clear prejudice to defendant of allowing plaintiff, after a five-day trial, to amend his pleadings and advance new theories of recovery never before set forth, and to claim a further trial on such theories militates heavily against allowance of such a motion. The Court therefore denies plaintiff's motion, having previously ruled that the case would be tried as alleged in the pleadings, that is, as a two-count Title VII case.

### B. Structure of Opinion

In the ensuing sections, the Court sets forth its Findings of Fact and Conclusions of Law as follows: first, findings are made with respect to the parties, the procedures governing tenure decision-making at the University of Massachusetts, and the actual sequence of events in the decision-making process in plaintiff's case. Second, the Court enters its initial Conclusions of Law discussing Title VII and the legal context of plaintiff's claims. Third, the Court makes "evaluative findings," following the approach of Judge Keeton in *Banerjee v. Board of Trustees of Smith College*, 495 F.Supp. 1148, 1150, 1159–61 (D.Mass.1980), *aff'd*, 648 F.2d 61 (1st Cir.1981) *cert. denied*, 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981), and explains the basis for its finding of liability. Fourth, the Court turns to the issue of remedy, making additional findings and discussing the dictates of Title VII. Finally, the Court explains its reasons for deferring ruling on the issue of attorneys' fees pending the submission of further materials germane to this issue by the parties.

### II. FINDINGS OF FACT

### A. Parties

1. Plaintiff Peter Kumar, formerly known as Prem Kumar, is a resident of Massachusetts and a former employee of the University of Massachusetts. He was born in Rawalpindi, India (now part of Pakistan) in 1943, and at the time of the partition of India and Pakistan in 1947, he left

his native area and moved to India. He received his Bachelor of Science Degree from the University of Delhi, India in 1964. Following a period of employment in India, he came to the United States and studied at the University of Wisconsin, receiving a Master of Science Degree in Industrial Engineering from the University of Wisconsin in 1967 and a Ph.D. in Finance from the School of Business of the University of Wisconsin in 1970. He commenced employment at the University of Massachusetts in 1970 and remained there until his employment was terminated in 1977.

2. The defendant Board of Trustees of the University of Massachusetts is an agency of the Commonwealth of Massachusetts established pursuant to M.G.L. c. 15 § 20 and is responsible for the governance of the three-campus state university pursuant to M.G.L. c. 75.

### B. Initial Appointment of Kumar and Employment Through Tenure Decision Years

3. Plaintiff was initially appointed as Assistant Professor in the University of Massachusetts School of Business Administration in the Department of General Business and Finance by letter dated February 23, 1970 from the President of the University. Plaintiff's Ex. 7.

Terms of this appointment included a starting salary of $14,500 a year if plaintiff had completed the requirements of his Doctoral Degree by the appointment's effective date of September 1, 1970, with a tenure decision to be made in 1975–76, inasmuch as plaintiff was credited with no years of service toward tenure. Kumar accepted the appointment on February 27, 1970, and came to the Amherst Campus of the University of Massachusetts in July or August 1970 after completing his doctoral program at the University of Wisconsin.

4. Plaintiff's initial appointment was "probationary," that is, without academic tenure. From 1970 through 1976, his appointment was renewed annually, and for each academic year an "Annual Faculty Report and Evaluation of Professional Activities" was prepared concerning him. Plaintiff's Ex. 9–15. Kumar taught both an introductory course in "Basic Finance" as well as advanced courses in financial models which he developed. During the period 1972–1976, he served as an editorial referee for the *Journal of Finance* and the *American Economic Review.* He also researched and published articles both on his own and in conjunction with another author. From 1973 through 1975, he served as the Director of the Master of Science in Finance Program of the Department of General Business and Finance in the School of Business Administration.

5. As previously noted, Kumar's tenure-decision year was designated at the time of his initial appointment as the academic year 1975–1976.

### C. Tenure Procedures

6. The policies and procedures governing tenure decisions, as well as other personnel decisions, at the University of Massachusetts were codified in June 1975 in a detailed and specific "University Academic Personnel Policy" (the "Policy") designated as Document T75–125. Plaintiff's Ex. 4. While this document was subsequently superseded on June 2, 1976 after the initial tenure review in plaintiff's case by a policy designated as Document T76–081, Plaintiff's Ex. 5, the policies and procedures set forth in these two documents do not differ in any respect material to the instant litigation; the Court refers to Document T75–125 in citing specific sections.

7. The Policy in Article I, Section 1.4 defines, *inter alia,* the following terms:

"Primary responsibility" . . . is the capacity to initiate recommendations, after appropriate consultation, which will be overruled only by written reasons stated in detail.

Faculty primary responsibility is the capacity to initiate recommendations in academic matters and in matters of faculty status.

"Tenure"—the right of a faculty member to continuous employment in an academic position until retirement age, subject to dismissal or suspension only as established in Trustee policy.

"Tenure Decision Year"—the academic year during which a faculty member is considered for an appointment with tenure.

8. Article II, Section 2.4 states that: In all personnel decisions, there will be equal opportunity for all persons without regard to race, color, religion, sex, age or national origin. Consistent with this principle, affirmative action shall be taken to increase representation of women and minority group members throughout the University. All applicable federal and state laws and regulations relating to equal employment opportunity and affirmative action are incorporated herewith, together with campus and University plans and procedures which have been promulgated to implement such laws and regulations.

9. Article III of the Policy is titled "Roles and Responsibilities in Personnel Matters." Section 3.2 states as follows: In matters of faculty status, such as . . . tenure, . . . , all components shall observe the principle of joint effort as stated in Trustee Policy T73–098. The Faculty has primary responsibilities in these matters [such as tenure]. The Trustees have the authority to make decisions in matters of faculty status and by statute may delegate this authority only to appropriate administrative officials.

As to specific Faculty responsibilities, Sections 3.4, 3.5, and 3.6 provide in pertinent part that:

Section 3.4—In exercising its primary responsibility in matters of faculty status, the Faculty shall subject individual qualifications to peer review based on a full, fair and impartial consideration of the relevant evidence.

Section 3.5—The exercise of primary responsibility by the Faculty shall also entail the following:

a) At the department level, the Faculty shall determine, subject to campus policy and governance procedures, the procedure for the exercise of its primary responsibilities in regard to both faculty status and to academic matters, and

for appropriate coordination between them. These procedures shall be designed so as to assure that the departmental faculty shall have the appropriate participation in the discharge of these primary responsibilities.

b) In each college or school, there shall be a personnel committee of the Faculty to review departmental recommendations, and to advise the Dean on personnel matters. The committee shall be chosen by procedures established on each campus in a manner designed to represent the interests of the Faculty of each college or school.

c) . . .

Section 3.6—When exercising primary responsibility through the making of personnel recommendations, the Faculty shall have the responsibility to present a clear and complete case for the recommendation so as to assure the faculty member of a complete presentation of his or her qualifications and achievements, so as to provide the basis for a full review of the recommendation.

10. Section 3.7 states that:

In exercising their responsibility, administrative officials shall review departmental recommendations, make their own recommendations, and where delegated authority to do so, make the appropriate decisions. In recognition of the principle of faculty primary responsibility in matters of faculty status, all administrative officials shall make a recommendation or decision which is counter to the Faculty recommendation only for compelling reasons in written detail which shall specifically address the content of the original recommendation as well as the established criteria. The President, in making tenure decisions, should disagree with the campus recommendation only in rare instances. Procedural standards established in Article VI [discussed *infra*] shall also be observed by administrative officials.

11. Section 3.8 refers to student participation:

Students will be assured the opportunity to participate in the personnel process, through contributing to the evaluation of a faculty member's effectiveness, particularly in teaching. Procedures for student participation shall be determined on each campus.

12. The remaining sections of Article III discuss the respective responsibilities of administrative officials in the personnel decision-making hierarchy culminating in the Board of Trustees. In ascending order, these officials are the Department Chairperson/Head, Section 3.9, the Dean of the College or School, Section 3.10, the Provost, Section 3.11, the Chancellor, Section 3.12, and the President, Section 3.13, who must seek the concurrence of the Board of Trustees for the award of tenure, Section 3.14. In the context of tenure decisions, as pertinent to the instant case, these sections impose specific responsibilities on the individual administrators.

The Department Chairperson/Head coordinates administrative matters, maintains personnel files, and compiles the basic file of material to support a recommendation. Further the Chairperson/Head keeps faculty members informed of their status, rights, and responsibilities, and reviews faculty recommendations concerning tenure and formulates a recommendation to accompany that of the personnel committee mentioned in Section 3.5(b).

The Dean looks to the interests of the particular college or school, ensures the establishment of a college or school personnel committee, reviews tenure recommendations from within the college or school, and after formulating a personnel recommendation, forwards the basic personnel file to the Provost.

The Provost is charged with ensuring that general criterial and procedural standards are consistently employed in all schools and colleges on a particular campus. The Provost reviews tenure decisions, formulates a recommendation, and forwards the file to the Chancellor.

The Chancellor reviews the tenure decision in the context of the particular campus and the University, makes a recommendation and forwards the file to the President of the University. The President is charged with ensuring that general criterial and procedural standards are consistently employed throughout the University.

The President reviews the previous tenure recommendations, and if a negative decision is made, must provide written reasons in detail. An award of tenure is subject to concurrence by the Board of Trustees.

13. Article IV of the Policy sets forth "Standards and Criteria for Personnel Reviews, Recommendations and Decisions," and Section 4.3 thereof provides that:

The standards and criteria described in this document and any standards and criteria established in Trustee-approved campus personnel policies shall be the only standards and criteria used in making and reviewing personnel recommendations.

A general guidelines for personnel decisions is established in Section 4.1:

High professional standards must be the basis for all personnel decisions. Personnel recommendations and decisions shall be made only after a review of all the qualifications and all the contributions of the individual in the areas of teaching; of research, creative or professional activity; and of service. All three areas must be considered, but the relative weight to be given each may be determined in the light of present and anticipated duties of the faculty member.

14. The standards to be employed in considering an award of tenure are established in Section 4.10:

The award of tenure can be made only by the President with the concurrence of the Board of Trustees. Consideration of a candidate for tenure shall be based on the following:

a) Convincing evidence of excellence in at least two, and strength in the third, of the areas of teaching; of research, creative or professional activity; and of service, such as to demonstrate the possession of qualities appropriate to a

member of the faculty occupying a permanent position.

b) Reasonable assurance of continuing development and achievement leading to further contributions at the University.

c) Detailed justification of the recommendation according to the review described in Section 4.2 [relating to program plans, projected department and college size, and departmental affirmative action goals].

Except in highly unusual circumstances, these criteria for tenure should be sufficient to merit promotion to Associate Professor.

15. Article V of the Policy is titled "Rights of Members of the Faculty in Academic Personnel Matters and Responsibilities as Conditions of Employment." Section 5.1 provides in pertinent part that:

Policies, criteria, and procedural standards established herein and additional policies, criteria, or procedures established on the campuses shall not infringe upon the following rights of faculty members in personnel matters:

a) For personnel reviews, recommendations, and decisions, the right to present all materials which he or she believes will be essential to an adequate consideration of the case, and the opportunity to supplement the original presentation with additional relevant information in the event that a review seems to indicate shortcomings in the presentation.

. . . .

d) The right to be considered for tenure if given an appointment or a reappointment through the end of the probationary appointment.

e) The right to equitable treatment in personnel matters so as to ensure generally consistent recognition to departmental faculty members whose chosen field, overall professional development, period of service on campus, and quality of contributions, all taken as a whole, are judged to be approximately equal.

. . . .

g) The right to be informed of the personnel recommendation made at the department, college or school, and campus level.

. . . .

i) The right to discuss reasons for a negative personnel decision at all appropriate administrative levels as specified in Section 6.10.

j) The right to invoke grievance procedures, under the conditions specified in Trustee grievance policy.

16. Article VI sets forth "Procedural Standards in Personnel Matters." Section 6.2(f) states that "[i]f tenure is not granted during the tenure-decision year, a terminal appointment for one academic year shall be made." Section 6.4 provides that the "process for personnel recommendations and decisions shall conform to the following guidelines:

a) The faculty member shall be advised by the Department Chairperson/Head as early as possible (in cases of . . . tenure, at the beginning of the academic year) that a review of his or her contributions will be made for the purposes of a personnel recommendation.

b) The faculty member shall submit to the Department Chairperson/Head any and all materials, for inclusion in the basic file, which he or she believes will be essential to an adequate consideration of the case.

c) For . . . tenure recommendations, the Department Chairperson/Head shall obtain outside letters of reference from a list of scholars and professionals which includes, but is not limited to, those suggested by the faculty member.

d) The basic file will be studied at all levels where responsibility for review, recommendation, or decision has been established. The basic file shall con-

tain such items as those in b) and c) and the following:

1. vita, bibliography, copies and/or reviews of published works;

2. appropriate evaluations of teaching effectiveness, including those of students;

3. evaluations of contributions to extra-departmental activities;

4. recommendations of the department and college or school faculty bodies and of appropriate administrative officials.

e) At the departmental level, there shall be a full, fair, and impartial evaluation of the qualifications of the faculty member that is based on the evidence set forth in the basic personnel file. The departmental recommendation when forwarded shall contain:

1. the recommendation of the departmental personnel committee ...;

2. ...;

3. in cases of reappointments through the tenure year and for tenure, a justification of the recommendation which will include a statement of the relationships described in Section 4.2;

4. if letters of recommendation are part of the basic file, a description of the professional standing of their writers;

5. the recommendation of the Department Chairperson/Head. When the Department Chairperson/Head makes a recommendation contrary to that of the departmental personnel committee, he or she shall send a copy of the recommendation to the chairperson of that committee, and to the faculty member.

f) At the college or school level, there shall be a review by the Dean and the college or school personnel committee of the departmental recommendation that is based on all the evidence in the basic personnel file. The following considerations shall apply to the college or school review and recommendation:

1. prior to a possible recommendation that may be contrary to that of the Department, the Dean shall invite the Department Chairperson/Head to provide additional information for the basic file or clarification of the departmental recommendation;

2. all information added during reviews of departmental recommendations shall become part of the basic file;

3. review of departmental recommendations shall take into consideration the qualifications of the individual and, for reappointments and the award of tenure, the justification of the recommendation within the context of college or school long-range plans;

4. when forwarded to the Provost, the recommendation shall include that of the college or school committee and that of the Dean. When the Dean makes a recommendation contrary to that of the originating department, he or she shall do so only for reasons written in detail, which shall specifically address the content of the original recommendation and the established criteria, and the Dean shall transmit a copy to the Chairperson/Head of that department and to the faculty member.

g) At the campus level, there shall be a review of the college or school recommendation that is based on all the evidence in the basic personnel file. The following considerations shall apply to the campus review, recommendation, and where appropriate, decision:

1. Prior to a recommendation or consideration that may be contrary to the recommendation from the next lower level, the Provost and Chancellor shall invite the officer at that level to provide additional information for the basic file or clarification of the recommendation;

2. Review of the recommendation shall take into consideration the qualifications of the individual, and, for ... the award of tenure, the justification of the recommendation within the context of campus long-range plans;

3. When the Provost and Chancellor make a recommendation or decision

contrary to the recommendation from the next lower level, it shall be only for compelling reasons, written in detail, which shall specifically address the content of the recommendations and the established criteria;

4. Copies of recommendations made by the Provost and Chancellor shall be sent to the Dean, the Department Chairperson/Head and the faculty member.

h) At the University level, there shall be a review of the campus recommendation for the award of tenure that shall be based on all the evidence in the basic personnel file. The following considerations shall apply to the University review and decision:

1. Prior to a decision that may be contrary to the recommendation of the Chancellor, the President shall invite the Chancellor to provide additional information for the basic file or clarification of the recommendation;

2. Review of the recommendation shall take into consideration the qualification of the individual and the justification of the recommendation within the context of University long-range plans;

3. The President should disagree with the campus recommendation only in rare instances and for compelling reasons in written detail which shall specifically address the content of the recommendation and the established criteria.

17. Section 6.10 of the Policy provides: Once a decision has been made by the appointing authority, the candidate may exercise the right of discussion at all administrative levels, beginning on the level where the first adverse recommendation was made. Prior to and at the level of the delegated appointing authority, such discussion may lead to a reconsideration of the recommendation or a change of decision. Beyond the level of the appointing authority, the discussion may lead to a request that the appointing authority review the decision. For decisions taken at the level of the President, the right of discussion may be exercised with the President and subsequently with the Chairman of the Faculty and Educational Policy Committee of the Board of Trustees.

*D. Sequence of Events in Review of Kumar's Tenure Case*

18. In accordance with the Policy, plaintiff's tenure review commenced in the Fall of 1975. On October 10, 1975, the Faculty Personnel Committee of the Department of General Business and Finance in the School of Business Administration recommended plaintiff for tenure by a 5–2 vote. Plaintiff's Ex. 53. By memorandum dated November 19, 1975, Plaintiff's Ex. 54, the Department Chairman, Sidney Sufrin, forwarded a positive recommendation for tenure to the Personnel Committee of the School of Business Administration. Sufrin summarized Kumar's qualifications in this memorandum setting forth Kumar's teaching, service, and publishing contributions, and commenting on his teaching as follows:

> Professor Kumar has been given the responsibility of developing quantitative courses in Finance that reflect (a) recent advances in the field, and (b) standards of high quality. At the undergraduate level he developed several new courses ... while simultaneously teaching Finance 201. Teaching technical matter has never been easy, but when the charge is to do this with mathematical rigor before an audience that contains a significant number of members who can be characterized as inimical to mathematics, the burden on the professor is indeed heavy. That Professor Kumar persevered, exhibited patience, and managed to offer sound courses of high quality attests to his maturity as a teacher.

> Student response to both his graduate courses ... and his honors section ... has been gratifying; enrollments have mushroomed from 25 to 60. Subsequently, he has assumed responsibility for the Financial Institutions courses....

His graduate teaching has included Micro Theory of Finance and Seminar in Finance. These too, Professor Kumar has taught with rigor and competence.

19. The School of Business Administration Personnel Committee by a vote of 6–0 recommended tenure for Kumar, and by memorandum dated November 18, 1975, Plaintiff's Ex. 52, summarized its position in forwarding its recommendation to Dean of the School, George S. Odiorne. In the memorandum, the Committee noted that:

Professor Kumar has established extremely high standards of class performance which he expects his students to meet. His student evaluations of teaching have not been as high as the Committee would like to see, but there is evidence of improvement in this area, and the Committee is satisfied that Professor Kumar is making determined efforts to improve his teaching performance.

Professor Kumar has demonstrated a record of growth and achievement in the academics of the School of Business Administration and this trend is expected to continue. It is the opinion of the School of Business Personnel Committee that Professor Kumar's promotion will clearly be in conformance with the objectives of the Finance Program of the School of Business Administration and of all standards of professional accomplishment and personnel policy.

20. Dean Odiorne recommended Kumar for tenure and forwarded his recommendation to Associate Provost David Bischoff in a memorandum dated December 17, 1975, Plaintiff's Ex. 21. In the memorandum, Odiorne remarked upon Kumar's distinguished scholarship in rigorous research and analysis at a quantitative level, and noted that:

There is a note of concern about his teaching, which was communicated to the Dean and Associate Dean, as noted in Dr. Wolf's letters. Kumar is foreign born, and his modes of communication are not that of a native born American. He is perfectly lucid in his language, but combined with one of the most technical and difficult courses, tends to produce lower ratings among non-majors in core courses. He is concerned about it and works at improving this dimension. The content of his courses is impeccable, his rigor unmatched, and the best students praise him highly. In technical sessions for his peers he is articulate and they have no problem.

When the chairman of the economic department at Princeton states a firm recommendation and indication from other persons of equal competence and prestige suggests that he would merit tenure at any institution, I would suggest that it would be great error to let him get away from us. The personnel committee deliberated upon his teaching and concluded that rigor and competence, specially at the advanced level would merit a unanimous recommendation. The possibilities that he may gravitate toward graduate courses where he is more successful and less in the introductory courses where the non-majors and less quant[itatively] competent students find him less pleasing is a possible solution. I concur with his chairman, his personnel committee, the school's personnel committee, and recommend approval of tenure and promotion.

21. By memorandum dated April 9, 1976, Associate Provost Bischoff expressed concerns to Dean Odiorne that while the Kumar file exhibited strength, and possibly excellence in research, Bischoff was unable to "find convincing evidence for strength in either teaching or service." Plaintiff's Ex. 88. Bischoff requested Odiorne's reaction to Bischoff's "firm belief that Professor Kumar's teaching has been and still is well below average for the department and the School. Unless this perception can be altered, I will have to recommend that he be denied tenure."

22. In response to Bischoff's memo, Dean Odiorne sought out additional information, on the one hand requesting that the departmental personnel committee review its recommendation, and on the other hand requesting that Associate Dean Jack Wolf garner additional information concerning

Kumar. The Chairman of the Personnel Committee of the Department of General Business and Finance, George Burak, by memorandum dated April 15, 1976, Plaintiff's Ex. 24, responded to Odiorne's request for information. Burak explained that he had met with two other members of the Personnel Committee and that their evaluation led them to conclude that Kumar's record supported a positive recommendation for tenure. Specifically, Burak commented:

Professor Kumar's selection of teaching materials, degree of preparation, manner of presentation, enthusiasm for subject matter and students, and organization are familiar to his colleagues. Based upon these factors, his rating is excellent. However, student reaction to the same set of factors has been uneven and in some cases somewhat disturbing to Professor Kumar and his colleagues. With both understanding and encouragement from colleagues, Professor Kumar has been more theoretically oriented in his teaching and research than the majority of his colleagues in the School of Business Administration. [Given] [t]he fact that a significant minority of School of Business students are "turned off" by theory, it is not surprising to find in a required masters level foundations course, with emphasis on theory, that some students might react negatively. Students' comments that are written exclusively for the instructor show negative reaction to the way in which Professor Kumar organizes the material. Generally, his organization departs significantly from that of the texts that are suitable for the courses Kumar has been teaching. Instead of giving Professor Kumar the benefit of the doubt that he may be leading the pack in terms of organization, students have a tendency to reject Professor Kumar's approach as being too different from that of the text. His colleagues appreciate the fact that he is at the frontier of the subject matter; some students could care less. In the long run, whose concern should be primary? We believe that peer review is more capable of appraising these facts then first year masters level students in Business Administration.

Additionally, Burak noted Kumar's improved teaching evaluations for the Fall of 1975, and the fact that evaluation in the larger section of one course placed him near the top of all School of Business faculty teaching in the Master's of Business Administration Program. Moreover, Burak indicated that the content of his memorandum had the unanimous approval of the committee.

23. Associate Dean Wolf responded to Odiorne's request by submitting to him a tabulation of twenty-four responses to a questionnaire composed and disseminated by a student organization comprised of students in the Master's of Business Administration Program. This tabulation of the results of an uncontrolled poll of students was to become known simply as the "Wolf Report," Plaintiff's Ex. 23, and was highly unfavorable to Kumar.

24. By memorandum dated April 23, 1976, Dean Odiorne responded to Bischoff. Plaintiff's Ex. 22. Submitted with this memorandum were the memorandum from Burak and the tabulation of the student poll which Odiorne referred to as the "Wolf Report." In the memorandum, Odiorne summarized the nature and details of the review conducted, and in somewhat veiled terms discounted the value of the Wolf Report. Although some concerns about Kumar's record were expressed, in conclusion, Odiorne stated that the departmental faculty, the School of Business Administration Personnel Committee, and the Dean all recommended tenure. In commenting upon Kumar's teaching, Odiorne mentioned that "[h]e is Asian born, speaks clear English but with an Indian accent, [and] close concentration is often required of his students."

25. By memorandum to Dean Odiorne dated April 27, 1976, Plaintiff's Ex. 25, Bischoff thanked Odiorne for his response, but indicated that he would recommend denial of tenure in Kumar's case. Specifically, Bischoff stated:

While I may be willing to grant Kumar has achieved excellence in research, I am

not convinced from the data available to me (i.e., the Wolf Report, etc.) that Dr. Kumar is even an average teacher in spite of what you cite as peer judgment about the content of his courses. This along with your assessment that his service is below adequate places Dr. Kumar well below the standards envisaged by the University. My assessment of Dr. Kumar's service is that it has been far less than should be expected of a faculty member in the professional schools.

26. By memorandum dated April 30, 1976, Professor Kent Monroe informed Dean Odiorne that Professor Kumar had shared a copy of the Wolf Report with him and set forth his evaluation of the poll. Plaintiff's Ex. 86. Monroe wrote that "[a]s a professional researcher, I am appalled with the procedure used in producing Dean Wolf's Report, and I am also appalled that the report should have been forwarded to the Provost's Office." Monroe severely criticized the methodology, or lack of methodology, employed in preparing the Report, expressed his view that forwarding the Report was a "serious professional error," and opined that Kumar had a legitimate grievance because of the use made of the Wolf Report. Monroe also expressed his opinion that expecting favorable student reaction to required, prerequisite courses of a theoretical and quantitative nature was "folly."

27. By memorandum dated May 3, 1976, Dean Odiorne replied to Bischoff concerning the negative recommendation in Kumar's case. Plaintiff's Ex. 28. Odiorne related the substance of Monroe's memorandum, and informed Bischoff that a petition in support of Professor Kumar signed by thirty students had been submitted to the Dean, a copy of which was attached. Odiorne also wrote as follows:

Your letter stating your position is appreciated. It has not changed the position of the departmental colleagues, of the School's Personnel Committee and the Dean affirming our judgment that Kumar should be awarded tenure.

Your letter also raises an interesting question about the personnel documents and policies: *How can the judgment of one individual who doesn't know the field of finance be superior and diametrically opposed to that of his academic peers?* [Emphasis in Original]

We are presently in the process of upgrading our Master's Program through stiffening its requirements. Kumar has already achieved that in his teaching through his rigor and depth of content. One further response to your letter with respect to service is indicated. Dr. Kumar is Director of the Master's Program in Finance. You state that this is merely "adequate" for service. It is our contention that it is adequate for tenure.

1. He directs one of the largest graduate programs in the University. There are departments elsewhere with fewer graduate students in the program that he directs who consider such administration (without relief from teaching) superior service.

2. None of our assistant professors are permitted to engage in extensive service early in their careers. It is our feeling that such distraction will consume too much of their time at a crucial point in their career, and such non-academic assignments are severely limited by conscious policy. They are directed to work on teaching, research, and personal advancement. Thus, Kumar is not inferior in service but exceptionally high for his rank and age, and this is adequate for service.

Also on May 3, 1976, Dean Odiorne forwarded to Bischoff a summary of official University student evaluations of Kumar for the Fall of 1975 which were highly favorable of Kumar, and noted Kumar's request that his evaluation for the Spring of 1976 also be considered in his tenure case. Plaintiff's Ex. 27.

28. By memorandum dated May 11, 1976, Kumar requested of Dean Odiorne that the Wolf Report be expunged from his tenure records as violative of University policy. Plaintiff's Ex. 30.

29. Chancellor Bromery and Acting Provost Alfange by memorandum dated

May 14, 1976 informed Dean Odiorne that they would support Bischoff's recommendation that Kumar not be granted tenure and instructed the Dean to process a one-year terminal appointment. Plaintiff's Ex. 29. Bromery and Alfange based their action on their conclusion that Kumar had "failed to achieve excellence, within the meaning of the Academic Personnel Policy, in any of the three areas of evaluation. . . ." The Chancellor and Acting Provost indicated that their decision had been made without considering the Wolf Report, as Kumar had requested. Further, they explained:

> [W]ith regard to teaching, while we have taken note of the fact that the evaluations of Professor Kumar's classes have improved dramatically in the past year, and that there is now a modest amount of vigorous student support for the award to him of tenure, the fact remains that all the available evidence of his teaching prior to this year indicates that its quality is well below average. On the basis of this, and even allowing for the sharp improvement in quality in the past year, it is impossible for us to conclude that Professor Kumar can in any way be described as having achieved excellence in teaching. With regard to research, we note the brevity of his list of scholarly publications. In six years, he appears to have only three full-fledged articles (as opposed to research notes or book reviews) in refereed journals. While the journals in which this work has appeared are unquestionably of top quality, the limited amount of actual publication makes it impossible to characterize his scholarly achievement as excellent, particularly in light of the serious deficiencies which have been noted in the teaching record. With regard to service, Professor Kumar has engaged in a modest amount of such activity within the School of Business Administration and off-campus. However, his involvement in service seems to have been at about the level we would routinely expect of all faculty members, and there is no evidence that it can be said to have risen to the level of excellence in any respect.

30. The Bromery-Alfange memorandum essentially terminated what may be referred to as the initial review of Kumar's tenure case. Subsequent proceedings in his case followed three identifiably distinct, although practically interrelated, courses. First, the tenure process itself continued through Kumar's exercise of his "right of discussion" as set forth in the Policy, Section 6.10. Second, Kumar invoked specific grievance procedures provided for under University rules mentioned in the Policy. See, e.g., Policy, Section 5.1(j). Thirdly, Kumar filed complaints initially on June 28, 1976, with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission ("EEOC") which culminated in this litigation. During the academic year 1976 through 1977, Kumar continued in the employ of the University under the one-year terminal appointment mentioned in the Bromery-Alfange memorandum.

31. By memorandum dated June 17, 1976, Plaintiff's Ex. 31, Kumar requested of Dean Odiorne that a grievance committee investigate the circumstances of his case. Dean Odiorne in a memorandum dated July 27, 1976, Plaintiff's Ex. 33, informed Kumar that the Academic Policy Committee of the School of Business Administration had considered his grievance, and that Odiorne had consulted the Chancellor's office with respect to the grievance. Odiorne indicated that since every component of the review process in the School of Business Administration—that is, department, school, and Dean—had recommended tenure, Kumar's grievance was with the Provost and Chancellor, and Kumar, if he should so decide, should take his grievance to the University Faculty and Tenure Grievance Committee. Odiorne further stated that he was informing this committee of the "favorable attention at our school level" given Kumar's grievance and indicated that Kumar should "make personal contact with the appropriate chairman of the Faculty Tenure and Grievance Committee of the Senate and request that they act further on your behalf." This memorandum terminated con-

sideration of plaintiff's grievance at the school level.

32. On August 24, 1976, Kumar pursuant to his right of discussion met with Provost Alfange. Associate Provost Bischoff also attended this meeting briefly. In the course of discussions, Kumar learned that not only was the Wolf Report still in his file, but also that important substantive data was missing from the file, including all his research and publication material, the official University course evaluation questionnaires for several of his courses, and his annual faculty reports, Plaintiff's Ex. 9–15. Alfange informed Kumar that he could resubmit the missing material, and indicated that the Wolf Report would not be considered. He also indicated that Associate Provost Bischoff would conduct the subsequent review.

33. On September 1, 1976, the EEOC assumed jurisdiction over plaintiff's case.

34. By September 3, 1976, Kumar had resubmitted the materials found to be missing in his file, and during September, October, and November, Kumar met three times with Bischoff. Together they reviewed the materials in the file, including faculty evaluations and student evaluations of Kumar's teaching. By memorandum dated December 14, 1976, Plaintiff's Ex. 34, Bischoff wrote to Dean Odiorne as follows:

> As you well know, I have been involved for some time with Dr. Kumar's appeal in regard to my earlier decision relative to his tenure. There are still several aspects of the case about which I need further written clarification. In the matter of Dr. Kumar's service, I have been convinced by Dr. Kumar and by you that his work in reviewing articles for professional journals should be counted as professional service. What I now require is evidence that Dr. Kumar's Department— especially his professional peers—have actively considered his *total* [emphasis in original] service and agree that his record in the service category is excellent. This may include an elaboration of the position I understand was taken in defense of Dr. Kumar's case when Robert Rivers,

George Burak, Sidney Sufrin, and yourself met with Chancellor Bromery and Acting Provost Alfange on May 11, 1976. In the matter of his teaching, the April 15 [1976] memorandum from Professor Burak indicates that he has been rated by his colleagues as "excellent" in terms of his "selection of materials, degree of preparation, manner of presentation, enthusiasm for subject matter and students, and organization of materials are familiar to his colleagues." This statement is certainly important in my consideration of his case. What I require is more detail from the Department and Dr. Kumar's peers as to the basis for such a statement and more specific identification of the group identified as "his colleagues."

35. The Personnel Committee of the Department of General Business and Finance in response to Bischoff's request met and by memorandum dated January 12, 1977, Plaintiff's Ex. 35, its Chairman, George Burak, informed the Department Chairman H. Richard Hartzler of the results of the meeting at which the entire committee attended—as well as Hartzler himself. Burak explained that three junior faculty members appeared before the committee and made statements in the presence of Kumar. Burak explained that the comments of these three faculty members were based primarily on hearsay in the form of "unsolicited" comments from students, that the three faculty members had failed to avail themselves of the opportunity to present comments to the committee during the previous year's evaluation, and that the three faculty members had made no efforts to ascertain the validity of the students' comments. For these reasons, Burak continued, the remarks of the three faculty members were considered invalid as an "unbiased" evaluation of a teacher's competence.

Burak also set forth in detail the basis for the committee's conclusion of excellence in service, remarking that the three junior faculty members did not concur in this view, but noting that two of the three had the opportunity to observe Kumar's service contributions for less than a year. Burak

remarked that as "noted earlier, all members of the committee are tenured and have observed Professor Kumar in his service role for the entire probationary period. The committee prefers to rely on its own collective judgment and by giving substantial weight to the journal review activity, the committee finds Professor Kumar's service activity is indeed excellent."

With respect to teaching, Burak discussed the evidence considered, reiterated the committee's reasons for discounting the remarks of the three faculty members ("None of them had ever provided any feedback to Professor Kumar with respect to the students' comments."), and expressed the committee's conclusion that "Professor Kumar's recent performance as a teacher warrants a finding of excellence." The committee's conclusions were unanimous.

36. Dean Odiorne attached Burak's January 12, 1977 memorandum to a memorandum dated January 17, 1977 from Odiorne to Bischoff, Plaintiff's Ex. 36, and in his accompanying memorandum summarized his view that "[i]n my opinion the information newly presented here confirms and bears out the position taken by the personnel committee when it appeared before the Chancellor on May 11, 1976." Odiorne noted that the "statements of the three untenured professors appearing [before the committee] state that his review service is meritorious and that his class materials are good." Additionally, Odiorne indicated that "the basis for their appearing in opposition are spelled out in separate memoranda which each prepared and which have been placed in Professor Kumar's file. They indicated that they based their evaluation on student comments or evaluations."

37. By memorandum dated January 28, 1977, Plaintiff's Ex. 38, Provost Puryear expressed an arrangement concerning delegation of his signatory responsibility, whereby, *inter alia,* he would exercise Provost's responsibility for tenure recommendations for faculty in the School of Arts and Sciences, Associate Provost Bischoff would "continue to have final responsibility for ... Tenure Recommendations ... for Faculty in the Professional Schools," and Acting Associate Provost Vere Chappell would have signatory responsibility for other matters.

38. By memorandum dated February 2, 1977, Plaintiff's Ex. 37, addressed to Provost Paul Puryear via Acting Associate Provost Vere Chappell, Associate Provost Bischoff related the facts of the initial tenure review in the Kumar case, summarized the process of Kumar's right of discussion, and indicated that his inquiries and concerns "at every turn" had been answered "in the most positive and unequivocally supportive terms," further noting that "[i]n addition, faculty members who felt it important to express their views in the case appeared to have been given the opportunity to do so (see January 17 memorandum from Dean Odiorne)." Bischoff concluded as follows:

At this point, in the face of the support of the School of Business Administration for Dr. Kumar *at all levels* [emphasis in the original], coupled with the persuasive responses provided to all my questions and concerns, I feel that I have no other choice than to recommend that Dr. Kumar be granted tenure and am forwarding his file to you for your review and consideration.

39. The news that Bischoff had reversed his previous position in Kumar's case was greeted with satisfaction by Dean Odiorne, some of Kumar's colleagues, and of course Kumar himself. Plaintiff's Ex. 39, 39A. However, in a memorandum dated February 9, 1977, Plaintiff's Ex. 40, addressed to Bischoff and Odiorne, Department Chairman H. Richard Hartzler attacked the prior leadership of the department, its tenure decision-making, especially in the case of Kumar, and expressed his intention to leave the University. Specifically, Hartzler wrote:

The Kumar decision should have resulted in a harsh reprimand of the participants, if it was judged to be a bad decision, rather than creating a situation where members of the Department were provided an opportunity to second guess each other, divide and redivide, and further

develop their mutual hostilities. The position I took with the faculty under the circumstances was—"it was a bad decision; but do not divide. Providing information is the only proper response to developments in the Provost's Office." I believe I was right.

Kumar subsequently learned of this memorandum and requested a copy from Hartzler, who by note informed Kumar that he could not find a copy but that as he recalled, "it was a reaction to the charge that our department made bad decisions. I tried to say we made tough ones so that the Provost would not be prejudiced against future decisions we will make." Plaintiff's Ex. 40A. Subsequently, Hartzler provided a copy to Kumar with a note stating "[f]or obvious reasons do not show this to Sid Sufrin or to Alex. This was intended to smooth the way for future cases." *Id.* Hartzler subsequently circulated a memorandum dated April 28, 1977 addressed to the Faculty of the General Business and Finance Department and entitled "Apology." Plaintiff's Ex. 41. Hartzler wrote:

> Recently in response to charges levelled at this Department by the Assistant Provost, David Bischoff, I expressed my frustrations in a self-serving memo. Being in an intemperate mood, I said many things without sufficient caution in my choice of words. Hardly anyone in the Department escaped my attention.

> That memo, which was intended as a confidential communication between administrators was used in a public way to the discredit of us all and with probable severe damage to some specific people. As author of the document, I must accept responsibility for its contents and its misuse. Specifically, I apologize to Jim Ludtke, Alex Barges, Sid Sufrin and the four area coordinators who served when the department was formally structured in groups. I apologize to Prem Kumar for any injury that improper use of this document may cause him. And generally, I apologize to you all. I am sincerely sorry that I uttered words that now can have no other effect than to aggravate

the deep seated problems of this Department.

As subsequently revealed, Hartzler's initial memorandum was made part of Kumar's tenure file, although it was not included in the files of any other faculty member mentioned therein. Moreover, Hartzler's apology was not included in Kumar's file.

40. Acting Associate Provost Vere Chappell by memorandum dated February 16, 1977, Plaintiff's Ex. 49, addressed to Dean Odiorne indicated that the "Kumar case has now been referred to the Provost for review and consideration" and requested that the memoranda of the "'three untenured professors' who apparently opposed the Personnel Committee's recommendation" be forwarded to him. In a postscript he remarked that he had added Hartzler's February 9, 1977 letter to Kumar's file and requested that the letter be added to Odiorne's file and that of the Department as well. Associate Dean Wolf supplied the memoranda, noting on a copy of Chappell's memorandum that "They have been here awaiting a request." Plaintiff's Ex. 87.

41. By memorandum dated May 11, 1977, Plaintiff's Ex. 42, addressed to Bischoff with copies to Chancellor Bromery, Associate Provost Chappell, Dean Odiorne, and Professor Kumar, Provost Puryear indicated that he had conducted his review pursuant to Bischoff's February 2, 1977 memorandum, and expressed his conclusion, based on his thorough study of the original tenure file and the material added since that time, that the original decision of April 1976 was correct and there was no basis for reversing the recommendation to deny tenure. Puryear stated that "[i]t is clear that teaching is the crucial factor in the judgment that Kumar ought not to be awarded tenure," and while noting that the file contained "a great deal of evidence intended to establish strength ... which no doubt points in that direction," nonetheless observed that:

> [T]here is also a significant amount of contrary evidence. Indeed, I have rarely seen a tenure file with negative assessments of teaching approaching the volume, variety, and credibility that one

finds in Kumar's case; and the negative evidence, in my judgment, clearly outweighs the positive. It is not of course, a matter of proportion of positive to negative comments. One has to judge in the appropriate context, and to compare this file with the general run of tenure files as a whole. In this light, the negative material on Kumar's teaching becomes decisive.

Puryear closed the memorandum by indicating that since there was no basis for reversing Bischoff's original recommendation, the "current situation" remained unaltered, and Kumar's termination date remained August 31, 1977.

42. By May of 1977, the EEOC investigation of Kumar's complaint was underway. Dean Odiorne on May 19, 1977 spoke with an EEOC investigator. In a memorandum dated June 16, 1977, Plaintiff's Ex. 89, Bischoff wrote to Odiorne expressing his shock upon learning of Odiorne's charge of widespread racism within the School of Business Administration and requesting that Odiorne list specific instances to document his charges. Odiorne replied in a memorandum dated June 20, 1977, Plaintiff's Ex. 90, relating the substance of his remarks to the EEOC investigator, specifically concerning events which occurred in 1975. Odiorne stated that as he was entering his conference room to meet with students representing the Graduate Business Association, he overheard students refer to Professor Kumar as "the little gook" and "that black bastard," and student comments such as "he has to go." The discussion stopped when Odiorne entered the room, but during the meeting—which was convened to discuss how the student group could provide input into the administration, of the school—the students indicated that they, as a group were strongly opposed to Kumar. Odiorne noted that the president of the group had been in Kumar's class and had encountered serious academic difficulty with the course. Odiorne continued:

2. ... *I did not see the* individuals speaking, *but heard them* [emphasis in the original] and entered the room imme-

diately after. The statements emerged from that group in that room. I obtained no subsequent repetition after bringing up the subject.

3. This is the same GBA group which did the survey of teaching which was later expunged from the basic Kumar file. Kent Monroe attacked the competence and representative character of the survey, and in fact the entire results of the survey were never published, released, and never submitted to me, only some segmented parts.

4. ... I saw no direct evidence whatsoever of racism in Whitmore [the Administration Building], *only to the extent that subsequently the personnel decision on Kumar lent credibility and weight to evidence generated by this student group. In my opinion, that evidence is properly impeachable evidence.* [Emphasis in original].

5. The students as citizens are entitled to their opinions, however wrong and despicable. They do not however have to be given the weight which they have been given. The School Personnel Committee and I weighed every bit of evidence including much which is not appropriate for an official file. This includes the above facts, and made our recommendation. If the views of this particular student group were not involved I am confident that the decision which has been announced would not have been made but an opposite one.

6. The extent to which these GBA officers (not necessarily widely representing the 300 or so students enrolled in that program) actively and persistently pursued their mission of getting a denial of tenure for Kumar is very visible. They worked hard upon several junior professors, and some administrators including the Dean. Unlike others, I was not willing to give the utmost weight to this group's opinions. I was unpersuaded by their motives and their evidence. Others, of good will, were persuaded, and were sufficiently strong in their persuasion to make an end run around the departmental peers, school committee, and dean (and the established procedures) to em-

bellish the record after the case left the school.

7. My testimony at the EEOC hearing on May 19 was that in my opinion the students in opposition to Kumar were not wholly impelled by racist motives. Inability to handle math was also a strong motive on their part.

Odiorne subsequently reiterated these facts and opinions in greater detail in an affidavit signed on August 31, 1977. Plaintiff's Ex. 91.

43. On or about June 17, 1977, Kumar filed a grievance, Plaintiff's Ex. 71, pursuant to University procedures as set forth in Trustee Document T71–023, Plaintiff's Ex. 32, with the University Tenure and Grievance Committee.

44. By letter dated June 27, 1977, Plaintiff's Ex. 73, Kumar citing provisions of state law, requested of Provost Paul Puryear a complete list of documents in his tenure file. Puryear responded by memorandum dated June 30, 1977, *id.,* and indicated that Kumar could inspect his file in the presence of any member of Puryear's staff. Kumar undertook this inspection on July 7, 1977, and discovered the presence of both the Wolf Report and Hartzler's February 9, 1977 memorandum in his file. Moreover, important substantive data were missing from the file. Plaintiff's Ex. 18. By memorandum dated July 14, 1977, Kumar informed Puryear of his inspection results, specifically stating:

Upon examination of my tenure file on July 11, 1977, some relevant documents were found to be missing—for instance, (1) the Alfange-Bromery memo of May 14, 1976, (2) my grievance memo of June 17, 1976 and Odiorne's June 21, July 27, 1976 responses. More significant is the absence of data considered in depth by Alfange and Bischoff relative to my appeal:

1. Research and Publication material;
2. My September 3, 1976 summary memo dealing with teaching effectiveness and copies of all supporting teaching data as well as instructional materials;

3. Annual faculty evaluation reports.

I am astonished, deeply upset, and gravely concerned that the above-mentioned data are missing. These data, to be sure, constituted the very basis for the Alfange-Bischoff hearing of my case, culminating in Bischoff's positive tenure decision of February 2, 1977. I urge you to locate the missing data and correct this wrongdoing without further delay.

Needless to say, the tenure file as it stands is once again incomplete. What is more it contains irrelevant, erroneous, and derogatory materials in violation of both the Academic Policy T75–125 and the Fair Information Act.

45. Kumar's employment with the University terminated on August 31, 1977. Subsequent consideration of his case was entirely pursuant to grievance procedures. Additionally, the District Director of EEOC issued a reasonable cause determination letter on November 25, 1977, Plaintiff's Ex. 1, and after the failure of conciliation efforts, issued a right to sue letter on March 7, 1978. Plaintiff's Ex. 2.

46. A Grievance Sub-Committee conducted an initial investigation into Kumar's grievance, and by September 1977 had determined that Kumar's grievance had substance. Efforts to resolve the matter informally proved fruitless. Acting Provost Jeremiah Allen, who had by then replaced Puryear, summarily refused to reconsider the tenure recommendation in Kumar's case. On October 31, 1977, the Faculty Senate Grievance Committee requested that Puryear and Bromery appear and testify. By memorandum dated November 14, 1977, Plaintiff's Ex. 85, Bromery responded as follows:

I have discussed your memorandum with legal counsel and am aware that Dr. Kumar has presented his case to the Equal Employment Opportunity Commission. The EEOC has been and is conducting an investigation. I have also been informed that an attorney in Boston apparently represents Dr. Kumar and has requested information from his files in anticipation of possible legal action. In light of the

above, and because Dr. Kumar is no longer an employee of the University, I must decline to appear before your committee.

47. A full panel comprised of seven members chaired by Professor Robert E. Jones conducted a formal hearing of Kumar's grievance on April 1, 1978 and issued its report and recommendation to Acting Provost Allen on April 18, 1978, Plaintiff's Ex. 43. The report summarized the proceedings in Kumar's tenure case, including references to negative comments expressed orally to Bischoff by members of the faculty of the School of Business Administration. In extremely forceful language, the Panel condemned the events involved in Kumar's case, referring to the use of the Wolf Report as a "shameful violation" of the University Policy, and finding further violations with respect to, inter alia, the oral comments made to Bischoff, the missing data in Kumar's file, and the review conducted by Chappell after Bischoff's positive recommendation, including the incorporation of Hartzler's memorandum and the memoranda of the three untenured faculty members into Kumar's file.

The Grievance Panel observed that in cases such as Kumar's, panels "commonly recommend that the matter be sent back to the level at which the violations began and the process be done anew in accordance with proper procedures." The Panel set forth its reasons for not recommending such action in Kumar's case as follows:

1. Twice Dr. Kumar's tenure decision has been reviewed at the Provost's level and twice the process has been botched to the personal and professional detriment of the grievant. To submit the grievant to a third such review strikes us as cruel, unusual, and improper.

2. More fundamentally, we believe it would now be impossible to process this case properly on the basis which it ought to have been processed in 1975–1976. The improprieties such as the Wolf Report that have crept into this case have proven difficult to expunge, and they have left residues and impressions that are impossible to expunge. This case has generated enduring animosities which are likely to affect the outcome of any new review. We do not believe that it is possible to turn the clock back to 1975 or process this case the way it ought to have been processed at that time.

The Grievance Panel therefore recommended that Bischoff's February 2, 1977 recommendation be forwarded as the operative decision of the Provost's office, not only because in the view of the Grievance Panel the February 2, 1977 recommendation was the official Provost's office recommendation under the memorandum of Puryear dated January 28, 1977, see Finding of Fact Number 37, supra, but also because that decision of Bischoff was the only "informed decision made in full knowledge of the facts and in full knowledge of the improprieties and mistakes committed during the making of the original decision," and was untainted by the improprieties which followed.

48. Acting Provost Allen replied to the Grievance Panel by Memorandum dated May 10, 1978, Plaintiff's Ex. 44. Allen agreed that no further review at the Provost's level should take place, "inasmuch as the case is now several years old and I doubt very much that a de novo review by me at this time could lead to a valid result." However, Allen continued:

I have forwarded Dr. Bischoff's memorandum of February 2, 1977 to Chancellor Bromery for his consideration as the Provost's level recommendation. I do, however, note a problem. Despite the delegation of signatory responsibility referred to by the Grievance Panel (Provost Puryear's memorandum of January 28, 1977) Dr. Bischoff's memorandum was internal to the Provost's Office, being addressed to Provost Puryear via Acting Associate Provost Vere Chappell. Moreover, when one notes (a) the closeness of the dates, only five days having elapsed between Provost Puryear's memorandum delegating responsibility and Dr. Bischoff's memorandum of February 2, one wonders whether Dr. Bischoff intended

his February 2 memorandum to be the Provost's level recommendation under the signatory authority which had been delegated to him on January 28. Possibly the February 2 memorandum may have been delegated to him on January 28. Possibly the February 2 memorandum may have been written before Dr. Bischoff was aware of the content of the January 28 memorandum. Nevertheless, as I said above, I am complying with the Panel's recommendation by forwarding Dr. Bischoff's February 2 memorandum to the Chancellor for his consideration.

With respect to Part (b) of the second recommendation [that Allen recommend reversal of the tenure decision embodied in the May 14, 1976 memorandum of Alfange and Bromery—see Finding of Fact 29, *supra*], I note a logical impossibility. You recommend that I reverse the negative tenure decision of May 14, 1976. To do so would amount to a positive recommendation for tenure, and in the absence of the review which the Grievance Panel's first recommendation precludes, I lack the data to substantiate such a recommendation as required by [the Policy] ... Sections 4.10 and 4.2.

49. By letter addressed to the Grievance Panel's Chairman dated May 14, 1978, Plaintiff's Ex. 45, Kumar acknowledged receipt of Allen's response and indicated his intent to appeal his grievance to the Board of Trustees. Kumar directed the Chairman to forward his entire case to the Board of Trustees. On May 15, 1978, by memorandum addressed to Acting President Franklin Patterson, Plaintiff's Ex. 46, the Chairman of the Grievance Panel did forward the appeal to the Board of Trustees.

50. On June 5, 1978, Kumar filed this action. On June 15, 1978, the Board of Trustees on advice of legal counsel suspended action on Kumar's grievance appeal. Subsequently, Kumar filed complaints alleging retaliation with the MCAD and the EEOC, and in December 1978 threatened through counsel to seek relief *"pendente lite"* from the Court. On December 6, 1978, the Board of Trustees agreed to resume consideration of the grievance appeal in return for withdrawal of the charges of retaliation.

51. Kumar's grievance appeal was presented to the Committee on Faculty and Educational Policy of the Board of Trustees, which requested that University President Knapp review the case and advise the Committee. Knapp, assisted by Vice-President of Academic Affairs Ernst Lynton, reviewed the grievance appeal, and by memorandum dated May 18, 1979, Defendant's Ex. B, addressed to the Committee on Faculty and Educational Policy, expressed "grave doubts as to whether all of the Tenure and Grievance Committee's findings of procedural error are valid," but noted "that question is not now before us because Provost Allen accepted the Committee's recommendation on May 10, 1978." Knapp further stated as follows:

There has, however, been no further action on the case at the Chancellor's level. Although there is no clear evidence that the review of the case by Chancellor Bromery and Provost Alfange which led to their initial negative decision on May 16, 1976 was procedurally flawed, the review was made in the context of a negative recommendation by Associate Provost Bischoff and there has been no opportunity for the Chancellor to reconsider his decision in light of the reversal of the recommendation at the Provost's level.

I recommend, therefore, that the Chancellor be directed to reconsider his earlier decision under the following terms:

(1) that the file be made complete by restoring the materials on teaching and service found missing on May 14, 1976 and July 11, 1977 when the tenure file was inspected by Professor Kumar ..., or, if these documents are unavailable, that the Department Chairman provide equivalent information.

(2) that the Chancellor consider Associate Provost Bischoff's February 2, 1977 memorandum as the relevant Provost's level recommendation.

(3) that the Chancellor exclude from consideration the so-called "Wolf Re-

**1320**

port" and the letter from Professor Hartzler of February 9, 1977 . . . .

Following the above terms, the Chancellor should proceed to consider "the contributions of the individual" and base his recommendation on "all the evidence in the basic file["] . . . . He has, therefore, both the right and the obligation to consider the substantive merits of the case.

52. By letter dated July 31, 1979, Plaintiff's Ex. 48, Chancellor Bromery wrote to President Knapp as follows:

Pursuant to your memorandum of June 7, 1979, I have now reviewed the complete tenure file and grievance materials of Professor Prem Kumar according to the conditions set forth in the memorandum dated May 18, 1979, from you to the Trustee Committee on Faculty and Educational Policy:

(a) The file was made complete by restoring the materials on teaching and service found missing on May 14, 1976 and July 11, 1977, before I made my review.

(b) In making my review, I considered Associate Bischoff's February 2, 1977 memorandum as the relevant Provost's level recommendation.

(c) Excluded from consideration during my review were the so-called "Wolf Report" and the letter from Professor Hartzler of February 9, 1977.

My review, made under the conditions described above, leads me to the conclusion that I cannot recommend Dr. Prem Kumar for tenure at this time. The file as amended does not contain "convincing evidence of excellence in at least two, and strength in the third, of the areas of teaching; of research; creative or professional activities; and of service, such as to demonstrate the possession of qualities appropriate to a number of the faculty occupying a permanent position." Specifically, my assessment leads to the conclusion that there is evidence of strength in (a) research and professional activity, (b) possible strength in service, but (c) no strength in teaching.

53. President Knapp informed Kumar by letter dated August 17, 1979, Plaintiff's Ex. 47, of the results of the Chancellor's review, and enclosed a copy of Bromery's memorandum. Knapp explained that Bromery's negative decision exhausted the appeals process, expressed his "regret" that the appeal had taken so long, and wished Kumar "good fortune" in his future endeavors.

54. On April 8, 1981, Kumar again inspected his tenure file and composed two schedules, "Schedule A" being a list of those items added since his inspection on July 11, 1977, and "Schedule B" being a list of those items missing from the file. Plaintiff's Ex. 75. Several of the documents listed as missing were favorable to Kumar's case, especially on the issue of teaching.

*E. Tenure Decision Concerning Professor Whiston*

55. During the academic year 1976 through 1977, the tenure case of Professor William B. Whiston began the review process. The Personnel Committee of the Department of General Business and Finance by memorandum dated December 15, 1976, Plaintiff's Ex. 82, recommended a denial of tenure to Whiston summarizing its findings as follows: "the Committee finds that Whiston is excellent in teaching, shows strength to excellence in service, but falls short of demonstrating to the majority of the Committee that he shows strength in research and professional activity relating thereto." Department Chairman Hartzler recommended acceptance of the Committee's negative recommendation by memorandum dated December 16, 1976. Plaintiff's Ex. 93.

56. The School of Business Administration Personnel Committee, however, recommended the award of tenure by a 4–1 vote. Plaintiff's Ex. 81. Dean Odiorne by memorandum to Associate Provost Bischoff dated February 11, 1977, Plaintiff's Ex. 92, "strongly recommended" the award of tenure to Whiston and summarized therein his basis for concluding that Whiston demonstrated strength in research and publication. The case was forwarded to the Provost's office, and Provost Puryear and Chancellor Bromery recommended tenure on

May 13, 1977 and forwarded Whiston's file to the University President on May 18, 1977. Whiston was awarded tenure.

## III. CONCLUSIONS OF LAW

1. Subject matter jurisdiction lies pursuant to 42 U.S.C. § 2000e–5(f)(3), all conditions precedent to the commencement of a civil action under Title VII having been satisfied by plaintiff. (Plaintiff's Ex. 2, 3).

2. 42 U.S.C. § 2000e–2(a) provides that: "It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

*Id.*

3. 42 U.S.C. § 2000e–3(a) provides in pertinent part that: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title [42 U.S.C. §§ 2000e–2000e–17]."

4. The defendant Board of Trustees of the University of Massachusetts is an employer within the definition of 42 U.S.C. § 2000e(b) and subject to the provision of Title VII.

■ 5. While courts have necessarily recognized the peculiar difficulties inherent in reviewing decisions concerning awards of tenure, *see, e.g., Banerjee v. Board of Trus-*

*tees of Smith College,* 648 F.2d 61, 64 (1st Cir.) *cert. denied,* 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981); *Huang v. College of the Holy Cross,* 436 F.Supp. 639, 653 (D.Mass.1977) (and cases cited therein); nonetheless, it is clear that Title VII applies to an employer's denial of tenure. *Banerjee, supra; Sweeney v. Board of Trustees of Keene State College,* 604 F.2d 106 (1 Cir. 1979) (following remand) *Kunda v. Muhlenberg College,* 463 F.Supp. 294 (E.D.Pa.1976), *aff'd,* 621 F.2d 532 (3rd Cir.1980); and *Huang, supra.*

■ 6. "The central focus of inquiry in [a Title VII disparate treatment] case such as this is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) *quoting Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Plaintiff Kumar bears the ultimate burden of establishing by a preponderance of the evidence that his race or national origin was a determinative factor in the decision not to grant him tenure, that is, that he would have been granted tenure by the defendant Board of Trustees of the University of Massachusetts but for his race or national origin. *Banerjee v. Board of Trustees of Smith College,* 495 F.Supp. 1148, 1151–52 (1980), *aff'd* 648 F.2d 61 (1st Cir.1981), *cert. denied,* 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 1639 (1981). *See also, Sweeney, supra,* 604 F.2d at 109.

■ 7. A disparate treatment plaintiff may of course attempt to prove his case by direct evidence. However, under the principles first announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and subsequently clarified in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), *see also Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25–29, 99 S.Ct. 295, 295–297, 58 L.Ed.2d 216 (1978) (per curiam) (Stevens, J. dissenting), a plaintiff employ-

ee may establish a *"prima facie* case" by establishing certain elements, whereupon the burden shifts to the defendant to "articulate" some legitimate, non-discriminatory reason for the employee's rejection. "The plaintiff, should the employer carry this burden, must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine, supra,* 450 U.S. at 253, 101 S.Ct. at 1093. The ultimate burden of persuasion remains at all times with the plaintiff, *id.,* although if "the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case," *id.* (footnote omitted), *see also Banerjee, supra,* 648 F.2d at 64–65 n. 8. The Court in *Burdine* explained that the *"prima facie* case serves an important function in the litigation: it eliminates the most common non-discriminatory reasons for the plaintiff's rejection ... [and] 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of unpermissible factors.' " 450 U.S. 253–54, 101 S.Ct. 1094, *quoting Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (citations omitted).

8. The First Circuit Court of Appeals has approved the following formulation of the elements of a plaintiff's *prima facie* case in the context of a Title VII case involving the denial of tenure:

(1) that the plaintiff is a member of a racial or national origin minority;

(2) that the plaintiff was a candidate for tenure and was qualified under the standards, practices or customs used in decision-making at the particular college or university;

(3) that despite his qualifications, plaintiff was denied tenure; and

(4) that tenure positions in the department or school of the college or university were open at the time plaintiff was denied tenure in the sense that others were granted tenure in the department during a period relatively near to the time plaintiff was denied tenure.

*Banerjee, supra,* 648 F.2d 61, 63. The Court of Appeals quoted with approval the district court's explanation of the second element:

[the plaintiff] need only show that he was sufficiently qualified to be among those persons from whom a selection, to some extent discretionary, would be made. That is, he need show only that his qualifications were at least sufficient to place him in the middle group of tenure candidates as to whom both a decision granting tenure and decision denying tenure could be justified as a reasonable exercise of discretion by the tenure-decision making body.

9. With respect to plaintiff's claim of retaliation pursuant to 42 U.S.C. § 2000e–3(a), plaintiff must establish by a preponderance of the evidence that defendant retaliated against him because of plaintiff's involvement in the protected activities mentioned in the statute. In the context of this case, plaintiff Kumar must prove that but for the defendant's retaliation against him, such retaliation alleged to have been the failure to consider his grievance in accordance with University procedures, he would have been granted tenure.

## IV. EVALUATIVE FINDINGS

### A. *Prima Facie Case*

■ 1. The Court finds that plaintiff Kumar established a *prima facie* case under Title VII and the pertinent cases. First, Kumar as an East Asian Indian is a member of a racial and national origin minority. Second, Kumar's qualification to be considered for tenure cannot seriously be disputed. The University Policy itself in Section 5.1(d) expressly provides the right to be considered for tenure to faculty members reappointed through the probationary period to the tenure-decision year. Furthermore, Kumar's departmental personnel

committee, department chairman, school personnel committee, and dean all positively recommended tenure. Associate Provost Bischoff upon Kumar's exercise of his "right of discussion" recommended that the negative tenure decision of the previous year be reversed. Finally, creditable testimony of witnesses indicated that Kumar had been performing at or above expectations during his probationary period. Third, that Kumar was denied tenure is undisputed. Fourth, a caucasian candidate for tenure in Kumar's department was awarded tenure during the year immediately following Kumar's tenure-decision year, and there was no suggestion in the evidence that tenure positions in Kumar's department or school in the University were closed.

### B. Reason Articulated for Denial of Tenure

2. Defendant's articulated reason for the denial of tenure to Kumar is that Kumar failed to satisfy the demanding criteria of the University of excellence in two, and strength in a third, of the areas of research, service, and teaching. While defendant has not presented the point succinctly, see Defendant's Requested Conclusions of Law No. 9, at p. 4, defendant argues that "the honestly held doubts of Bischoff (at least initially), Alfange, Puryear, and most importantly, Bromery about plaintiff's achievements in teaching, service and research constitute legitimate, non-discriminatory reasons for the denial of tenure ....." The Court views this articulated reason as essentially directed to the decision-making of Bromery after President Knapp had remanded the case to him for review. The significance of Bischoff's initial review, and the recommendations of Alfange and Puryear as expressing legitimate, non-discriminatory reasons is, on the Court's assessment of the evidence presented, severely diminished by the procedural violations attending those reviews, which violations the Court finds as a matter of fact. These violations and the inferences drawn therefrom are discussed in more detail *infra*. At this juncture, the Court

merely notes that the evidence presented established that important, substantive data supportive of Kumar was absent from his tenure file during the critical periods of Bischoff's initial review, Alfange's review in conjunction with Bromery in May 1976, and Puryear's consideration of Bischoff's recommendation that the negative tenure recommendation be reversed. While there is reason to doubt whether even Bromery at the time of his review in 1979 had a complete tenure file before him, it was his decision at that time which ultimately terminated substantive decision-making in Kumar's tenure case.

### C. Pretext

3. The Court finds that the reason articulated by defendant is pretextual.

4. In his letter to Knapp indicating the results of his review, Bromery stated that he had treated Bischoff's recommendation of reversal as the relevant Provost level recommendation in accordance with President Knapp's instructions. In fact, as Bromery testified, this was only partially true. Bromery testified that he had considered Bischoff's recommendation as the Provost's level review only for "procedural purposes," and when asked if this comported with Knapp's instructions, explained that the President and he could disagree. Such disagreement as to the proper treatment of Bischoff's recommendation was of course not expressed in Bromery's letter, and from all appearances the recommendation of the one Provost level official who had the full benefit of virtually all materials germane to Kumar's case—untainted by the Hartzler letter and the memoranda of the three untenured faculty members—and an awareness of the unreliability of the Wolf Report was given no substantive weight in Bromery's review.

5. Bromery's statements in his letter to Knapp concerning research and service, as subsequently explained at trial, lacked credibility, and the conclusions expressed concerning research and service undercut his credibility on the issue of teaching. The evaluation of plaintiff's research and ser-

vice by his peers, both as expressed in the documentary evidence and as testified to at trial, remained constant throughout the tenure review process. His peers were unquestionably in the best position to assess the rigor and thoroughness of his research and his scholarly contribution to his field. The implications of his service contributions both as the coordinator of the Master's program in finance and as a referee of articles in the most prestigious publications in the field of finance were thoroughly evaluated, and during the "right of discussion" process, the classification of refereeing as "service" was clarified. The Court also credits Kumar's testimony that he never refused any service assignments while he was employed at the University. Given the assessment of Kumar's research and service by his peers as excellent, and even outstanding, Bromery's summarily stated conclusion of "evidence only of strength in (a) research and professional activity, (b) possible strength in service . . .," is not credible.

6. At trial, the focus of defendant's efforts to articulate a legitimate, non-discriminatory reason for the denial of tenure was plaintiff's teaching. At first blush, the evidence of record would appear to suggest that plaintiff's teaching, irrespective of the "evaluation" set forth in the Wolf Report, was a source of concern because of student evaluations of his teaching performance on official University questionnaires. However, peer assessment of Kumar's teaching had resulted in a conclusion of excellence based upon his preparation, command of material, organization, enthusiasm, and other factors. A fellow professor who had participated in courses taught by Kumar and who was apparently the only non-student to observe Kumar's teaching first hand, submitted a letter to Kumar's file in support of Kumar which highly praised his teaching. Kumar himself testified that during his probationary period he was never advised through official University channels of any deficiencies in his teaching, but rather offered the demanding, quantitative courses which he had been hired specifically to teach.

7. Bromery, who like the other University officials involved in the tenure process had never experienced Kumar's teaching first hand, testified that he based his negative assessment of plaintiff's teaching upon statistical compilations of anonymous student course evaluations undertaken pursuant to University procedures and compiled on University forms. However, Bromery's testimony with respect to his review and use of these compilations was at best inconsistent and at worst entirely incredible. Specifically, Bromery testified that while the official University evaluations are considered generally useful, he admitted that there are recognized limitations in the use of these evaluations and the statistical compilations drawn therefrom as an accurate assessment of teaching performance. Several witnesses testified to like effect, and plaintiff introduced the 1972 Report of a Task Force which examined the use of student evaluations in the School of Business Administration which noted the "danger of too much emphasis on the student questionnaire." Plaintiff's Ex. 79. Bromery agreed that student evaluations were especially unreliable in introductory courses with rigorous, quantitative content—and should thus be given less weight—while evaluations generally tended to be more accurate assessments in advanced courses. However, in Kumar's case, to the extent that the record reveals the results of student evaluations with any certainty (defendant having never introduced the actual compilations upon which Bromery purportedly relied), low evaluations were generally in his introductory courses where students encountered great difficulties with the quantitative content of his courses, while evaluations of his more advanced courses were favorable.

8. Further, there was substantial testimony at trial which suggested that the heavy emphasis placed upon plaintiff's teaching in the review of his tenure case was in and of itself a pretext for denying tenure, that is, that in the tenure process teaching was given only mild attention while the real emphasis was placed upon research and publication. Witnesses for both parties did agree that a conflict of

views existed and still exists among various factions at the University. On its face, of course, the Policy is neutral. The Court does not find that the emphasis placed on teaching was necessarily pretextual.

9. Rather, on review of all the evidence, the Court finds that the articulated reason of "no strength in teaching" is not credible. While some materials properly included in Kumar's file might have suggested some problems in the area of teaching, these materials by defendant's witnesses' own testimony were unreliable indicators of teaching performance. The careful assessment made by Kumar's peers, the evaluations of his advanced courses, letters of support from students, and the assessment made by a fellow faculty member who actually observed Kumar's teaching first hand were all strongly supportive and indicated excellence, or at the very least, strength, in teaching. In sum, the Court finds that the statistical compilations were relied upon not as a means of conducting a full and fair evaluation of Kumar's teaching abilities and performance, but rather as a pretextual means for denying tenure.

*D. The Wolf Report*

█ 10. On the basis of the Odiorne affidavit, as well as Odiorne's trial testimony, the Court finds that an attempt to undermine Kumar's tenure position because of his national origin was made by students in the Graduate Business Association. Had University procedures been followed, these attempts most likely would have been of no avail. However, while Odiorne's testimony concerning the action of students provided the most cogent direct evidence of discrimination against Kumar, in some respects this testimony deflects attention from the real impact and significance of the Wolf Report. That Associate Provost Bischoff sought additional information about Kumar before making a negative recommendation is not of itself objectionable. Former Vice President of Academic Affairs Lynton testified creditably that one level in the review process may seek additional information from a lower level before entering a contrary recommendation. Further, Dean Odiorne's request of Associate Dean Wolf for more information comported with this practice.

However, it is clear that Wolf sought out only negative information concerning Kumar and maintained a position adverse to the award of tenure to Kumar. Significantly, despite the full opportunity to do so, Wolf had not presented any information to the departmental or school personnel committees concerning Kumar's teaching, but rather employed less formal means to provide negative information. Wolf's motives may be questioned, especially in light of the marginal note on Chappell's request for the memoranda of the three untenured faculty members opposed to the award of tenure to Kumar.

11. Although the Wolf Report did provide a means for the discriminatory attitudes of some students to pervade the decision-making in plaintiff's case, the Court finds more troubling the failure of University officials to expunge the document from Kumar's file. Instead, officials stated that it would not be considered in their review. However, whether this was the case or not is at least questionable. Indeed, Bromery at trial when shown the Wolf Report testified that it appeared to be a valuable assessment upon which he would rely in considering teaching performance.

12. While Odiorne's forwarding of the Wolf Report to Bischoff may be viewed as an error, to which no greater significance can be attached than to his remarks concerning Kumar's national origin in his memoranda supporting tenure, the maintenance of the Wolf Report in plaintiff's file has never been satisfactorily explained. As Bischoff parenthetically indicated in his April 27, 1976 memorandum, the Wolf Report played a significant role in his decision not to recommend tenure. The results of the student survey were never otherwise compiled or presented to University officials, but rather were used solely in consideration of Kumar's tenure case. Moreover, even after being discredited, the Wolf Report remained in Kumar's file, where, as the testimony of Bromery indicated, it could affect subsequent review of Kumar's case

by those unfamiliar with its worthlessness as an objective evaluation of Kumar's teaching.

13. The Court finds that the initial dissemination of the Wolf Report and its continued maintenance in Kumar's file more likely than not adversely affected the substantive review of plaintiff's case above the school level and that the use of an unofficial, unscientific "opinion poll" as a means of assessing only plaintiff's teaching, and the continued presence of the report in Kumar's file despite plaintiff's request that it be expunged was at least in part the result of intentional discrimination against plaintiff because of his race or national origin. The opportunity to rectify the misuse of the raw data which comprised the Wolf Report remained open at all times to University officials, but no decisive steps were taken to expunge the Wolf Report permanently from the tenure case or to mitigate its impact on the decision-making process.

*E. Statistical Evidence and the Whiston Case*

14. Kumar was the only non-white (non-caucasian) candidate for tenure in the School of Business Administration during the period 1974 through 1977, Statement of Agreed Facts, ¶ 18, and he was the only candidate denied tenure. This statistic is not significant in and of itself, but does assume importance when viewed in light of a comparison of the Kumar case and the Whiston case.

15. Defendant concedes that Kumar's tenure review was the only case where a positive recommendation from the departmental faculty committee in the School of Business Administration was followed or accompanied by informal communication of concern opposed to the award of tenure, although there were several cases where negative recommendations were followed by informal contacts by faculty in support of the award of tenure. Statement of Agreed Facts ¶ 24. In Kumar's case, notwithstanding the positive recommendations of his departmental personnel committee, his department chairman, the school personnel committee, and the dean, efforts were

subsequently made at the Provost level to garner negative information concerning his case. The first review by Bischoff led to inclusion of the Wolf Report in Kumar's file. The peculiar intermediary review by Chappell following Bischoff's recommendation of reversal prompted the inclusion of the memoranda of the three untenured faculty members and the Hartzler letter in Kumar's file. In both cases, the Court notes in passing, the information adverse to Kumar was supplied by Wolf. In stark contrast, after the caucasian candidate Whiston had received a negative recommendation from the departmental personnel committee and his department chairman, substantial efforts were made to find and include positive information in his tenure file. While there can be no doubt that Whiston's and Kumar's cases were different in the issues raised concerning their qualifications, defendant's assertion that all the Whiston case demonstrates is that departmental recommendations were not sacrosanct hardly explains the disparity in the administrative treatment of the two cases. In any event, such discrediting of departmental recommendations does not explain the ready administrative acceptance of the positive recommendation of the School personnel committee and dean in Whiston's case and the determined resistance to such recommendations in Kumar's case.

16. Bromery at trial stated that he had lost confidence in the recommendations of the School of Business Administration in tenure cases, suggesting that the School was less rigorous than others in the award of tenure. Yet, plaintiff's evidence powerfully undercut the credibility of this testimony, especially with regard to the number of faculty in the School who had been persuaded to seek employment elsewhere because they would not be recommended for tenure by the School. Further, there was no evidence indicative of a loss of confidence in the School's recommendation when the Whiston case was considered and acted upon positively.

*F. Procedural Violations*

17. The Court's findings with respect to the *prima facie* case and rebuttal of defend-

ant's articulated reasons portend and subsume to a greater or lesser extent the Court's findings concerning violations of the University Policy in the review of Kumar's case. It must needs be observed that there was no suggestion that the denial of tenure in Kumar's case was based on factors such as future needs of the Department of General Business and Finance, the School of Business Administration, or the University. Rather, the decision was purportedly based solely on the merits of Kumar's record in light of the established criteria. The decision-making in Kumar's case, however, often proceeded on the basis of an incomplete tenure file.

18. Both the University Policy and the testimony of witnesses established that the basic tenure file is central to the tenure review process. The Policy provides for the right to fair and equitable treatment, and the purpose of the file is to ensure that every level in the process is confronted with the same evidence concerning the case, although further information may be requested where a reversal is contemplated. The Court finds that Kumar's file was repeatedly incomplete, and that the missing, substantive data was most frequently supportive of his case. While defendant has suggested that it is not surprising that some documents might be separated from the basic file, the Court is hardpressed to accept this suggestion at face value. Tenure is an extremely important decision in the life of an academic, and the University Policy reflects this fact in its careful attention to the details and procedures governing the tenure decision. There was no testimony or documentary evidence offered to explain how or why Kumar's file became incomplete; neither did defendant offer evidence tending to show that tenure files are routinely mismanaged resulting in the exclusion of supportive data and the inclusion of negative information. Indeed, apparently Bischoff's review of Kumar's case during the "right of discussion" process was the only review conducted with the full benefit of all supporting materials prior to the active stage of the EEOC's investigation.

■ The Court finds that violations of both the letter and spirit of the University Policy repeatedly occurred in the consideration of Kumar's case resulting in the exclusion of supportive data from his file and the inclusion in his file of improper materials adverse to his case.

### G. Retaliation

■ 19. With respect to plaintiff's specific claim that defendant retaliated against him in the consideration of his grievance appeal, the Court credits the testimony of former Vice-President of Academic Affairs Lynton that internal proceedings were suspended in plaintiff's case because of external litigation pursuant to a custom of the University developed on a case by case basis and not as a result of an intent to retaliate specifically against plaintiff for filing his court action. Further, the Court finds that the procedural treatment of Kumar's appeal when actually undertaken comported with the informal practices developed after the defendant Board of Trustees had delegated authority to award tenure to the President (with the concurrence of the Board of Trustees) and that the full review by the Board in another case involving tenure was anomalous. The Court must question whether suspension of consideration of Kumar's grievance appeal was entirely in good faith, however, for Kumar under the Policy was clearly entitled to invoke grievance procedures, the suspension of consideration of his appeal took place without notice to him, and once Kumar learned of the suspension and threatened to seek judicial relief, consideration of his appeal proceeded. However, on balance, the Court finds no retaliatory motive in the suspension and procedural treatment of Kumar's appeal.

■ 20. The Court does, however, draw an inference from Bromery's refusal to appear before the Faculty Grievance Panel, the review conducted by the President assisted by Lynton, and Bromery's subsequent review of Kumar's case. The Court finds that the treatment of Kumar's grievance appeal is indicative of an administrative intransigence to correct the procedural vio-

lations in Kumar's case and fully and fairly consider the merits of his tenure case in accordance with University procedures, and that this intransigence is further evidence of disparate treatment of Kumar.

### H. Liability

The Court finds from the evidence presented and the inferences drawn therefrom that the denial of tenure to plaintiff was the result of intentional discrimination against him because of his race and national origin, and concludes that the defendant Board of Trustees of the University of Massachusetts is liable to plaintiff for such discrimination.

### V. REMEDY

42 U.S.C. § 2000e–5(g) provides in pertinent part that upon the finding of an unlawful employment practice, "the court may ... order such affirmative action as may be appropriate, which may include, but is not limited to reinstatement or hiring of employees, with or without back pay ... or any other equitable relief as the court deems appropriate, and that "[i]nterim earnings or amounts earnable with reasonable diligence by the person ... discriminated against shall operate to reduce the back pay otherwise allowable." As stated by the Supreme Court in *Albemarle Paper Company v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975), "it is also the purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination. This is shown by the very fact that Congress took care to arm the courts with full equitable powers." The Supreme Court further indicated that "given a finding of unlawful discrimination, back pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purpose of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Id.* at 421, 95 S.Ct. at 2373.

In the instant case, the fashioning of an appropriate remedy for the defendant's un-lawful discrimination against plaintiff presents an apparently unique problem. At trial, plaintiff through counsel informed the Court that he no longer sought reinstatement as a tenured professor at the University of Massachusetts. This decision of the plaintiff is understandable to the Court, and indeed appears reasonable in light of the animosities and hostilities generated during review of his tenure case and perhaps the subsequent litigation as well. It cannot be gainsaid that collegiality is the goal of every faculty and administration; Kumar no doubt has every reason to suspect that his collegial participation in the academic and administrative functions of the University of Massachusetts is at this juncture a lost opportunity.

At the close of the evidence in this case, the Court requested that the parties address the issue of an appropriate remedy in their respective proposed findings of fact and conclusions of law. Plaintiff has proposed, and has submitted an offer of proof, that defendant be ordered to pay to plaintiff the "cash equivalent" of a lost tenured position for the expected lifetime of plaintiff's employment, discounted fairly to present value. By plaintiff's proffered calculation, this amount equals $1,170,000.00 exclusive of back pay. Additionally, plaintiff has submitted that back pay, together with fringe benefits, totals $202,400.00, to which interests and costs should be added.

Defendant's view, not surprisingly, is radically different. Defendant contends that plaintiff's remedy should be limited to one year's back pay based on the time plaintiff should have spent seeking another position after his termination at the University in August 1977.

The Court concludes that an award of back pay is consistent with the purposes of Title VII, but is unable to agree with plaintiff that in the absence of reinstatement, he is entitled to the cash equivalent of a lifetime appointment at the University. Such a remedy would far exceed the "make whole" policies of Title VII and serve as a windfall to plaintiff, inasmuch as he may still seek employment, either at another ed-

ucational institution or in the private sector. Further, the remedy proposed by plaintiff is more in the nature of compensatory and punitive damages, which are not provided for in Title VII. See cases collected at 38 A.L.R.Fed. 338, 338–59.

However, neither is the Court persuaded that defendant's suggested remedy is fair and equitable. Plaintiff testified as to the repeated efforts he had made to secure either a teaching position or other suitable employment. Concededly, plaintiff confined his employment search to the geographic area of Western Massachusetts, but given plaintiff's circumstances, including the pendency of his grievance appeal and the possibility that he would be awarded tenure, his attention to this litigation, and his established residence in Western Massachusetts, the Court is unable to conclude that Kumar's decision not to undertake a nationwide job search reflects a lack of diligence on his part.

■ Upon consideration, the Court concludes that a reasonable remedy consistent with the purposes of Title VII is the award of back pay, together with fringe benefits, for the period covering the academic years 1976–1977 through 1982–1983, and interest thereon at a rate to be determined by the Court. For the academic year 1976–1977, plaintiff should receive the difference between the salary and fringe benefits of a tenured faculty member and the amount of salary and benefits he actually received as a professor serving a terminal appointment year. For the remaining period, the amount of back pay and benefits to be awarded plaintiff must be reduced by the amounts he actually otherwise earned during these periods.

Because on the evidence presented the Court is unable to calculate these amounts with certainty, the Court will order that counsel for the parties meet within thirty (30) days and together attempt to arrive at an adjusted amount of back pay and benefits consistent with the Court's Order. The parties are to report to the Court within forty-five (45) days. If the parties are unable to agree, the Court will bring the matter forward for a hearing, and after receiving evidence, make its own calculation.

While the Court's remedy cannot restore plaintiff to the position he would have held but for the unlawful discrimination of defendant, it is consistent with the provisions of Title VII and affords plaintiff substantial monetary relief together with the vindication of his right to be free from race and national origin discrimination. To the extent that defendant complains that the amount is excessive, it suffices to note that defendant not only had ample opportunity to correct the unlawful discrimination against the plaintiff, but also contributed substantially to the delay in Kumar's grievance appeal, and thus ultimately to the resolution of this litigation on the merits.

## VI. ATTORNEY'S FEES

■ Plaintiff after trial submitted materials relevant to an award of attorney's fees. 42 U.S.C. § 2000e–5(k) permits the Court, in its discretion, to award fees to the prevailing party. The Court concludes that this is an appropriate case for an award of fees, but at this juncture the Court requires more detailed information in order to make an appropriate determination of fees in accordance with the approach sanctioned by the First Circuit Court of Appeals. *See, e.g., Furtado v. Bishop,* 635 F.2d 915, 919–21 (1st Cir.1980) (awards of fees pursuant to 42 U.S.C. § 1988). Therefore, the Court holds the issue of an award of fees in abeyance pending counsels' reports on their success in calculating the award in accordance with the Court's Order and, once the amount of the award is determined, either by agreement or by the Court, the Court will receive further materials germane to the issue of fees from the parties and calculate an appropriate award of attorney's fees. In the interim, of course, the parties may attempt to negotiate a settlement of the fees issue.

## CONCLUSION

For the reasons stated herein, the Court concludes that plaintiff Peter Kumar, formerly known as Prem Kumar, established by a preponderance of the evidence that the

defendant Board of Trustees of the University of Massachusetts unlawfully discriminated against him because of his race and national origin as alleged in Count I of the Amended and Supplemental Complaint, but that plaintiff failed to establish that defendant retaliated against him as alleged in Count II; that plaintiff is entitled to an award of back pay for the period covering the academic years 1976–1977 through 1982–1983, reduced by amounts actually earned by plaintiff during said period with interest on the adjusted amount of the award; that calculation of the award and adjustments should be attempted by the parties within thirty (30) days, and reports submitted to the Court within forty-five (45) days, and if the parties cannot calculate and adjust the award, the Court will hold a hearing on the issue, receive evidence, and determine the amount; and that an award of attorney's fees is appropriate in this case, but that such award shall be held in abeyance pending calculation of the back pay award, at which time the Court will receive materials germane to the issues of fees and determine an appropriate award of attorney's fees.

Order Accordingly.